IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

CASE NO.: 1:16-CV-21746-UU

BONAMAR, CORP.,

    Plaintiff,

v.

TROY TURKIN and SUPREME CRAB &
SEAFOOD, INC.,

    Defendants.

## PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

Pursuant to Fed. R. Civ. P. 65, Plaintiff Bonamar, Corp. ("Plaintiff") moves for entry of a preliminary injunction against defendants Troy Turkin ("Turkin") and Supreme Crab & Seafood, Inc. ("Supreme") (collectively, the "Defendants"), and states as follows:

## INTRODUCTION

Injunctive relief is necessary to protect Plaintiff's confidential client/customer data that was misappropriated by Turkin (a former employee) and is now being utilized by Turkin and Supreme (his current employer) to unfairly compete with Plaintiff in the market.  As set forth herein, there is abundant evidence that, prior to abruptly ceasing his employment with Plaintiff, Turkin copied a substantial amount of Plaintiff's customer and sales data (which he was contractually prohibited from doing) to an external hard drive/flash drive.  Following his termination of employment, Turkin immediately began employment with Supreme as its Chief Operating Officer.  Since that date, Turkin and Supreme have been utilizing Plaintiff's customer and sales data to target Plaintiff's customers and undercut Plaintiff's pricing in an effort to gain a

competitive advantage in the marketplace. This is confirmed not only by the fact that multiple customers have contacted Plaintiff to confirm the solicitations, but also by one of Supreme's own former employees who personally witnessed Turkin and Supreme openly discussing Plaintiff's confidential information and distributing it to Supreme's sales team.

All of the factors supporting injunctive relief are present here. The Court should not tolerate Defendants' efforts to gain a competitive advantage through the theft/misappropriation of confidential data (which was contractually protected). Rather, the Court should order the return of Plaintiff's confidential data (which Defendants never had a right to in the first place) and preclude Defendants from utilizing it any further. Without this relief, Plaintiff will clearly suffer irreparable harm.

## BACKGROUND

### A.     Plaintiff's Business

Plaintiff is an importer, exporter, and distributor of premium crab meat and various other seafood.[1] Its products are imported from around the world from areas such as South America, Southeast Asia, China, Mexico, and the Western Pacific Rim area.[2] Plaintiff's mission statement is to be known as a seafood specialist with emphasis on crab meat, and Plaintiff has accomplished this through more than a decade of building meaningful and long-lasting relationships with customers and vendors alike.[3] Plaintiff's products, which are generally sold under "Sebastian" or "Crystal Harbor" labels, are available in major grocery stores and utilized

---

[1]     See Declaration of Argenis Contreras, dated June 13, 2016 (the "Contreras Decl."), a true and correct copy of which is attached hereto as Exhibit A, at ¶ 3.

[2]     Id.

[3]     Id.

in upscale restaurants throughout the United States and internationally.[4] Plaintiff is a market leader in the products that it imports, exports, and distributes.[5] Plaintiff markets and sells its products primarily through its direct sales force.[6] The sales cycle often begins with a sales lead generated through marketing efforts, customer referrals, and/or calls placed to prospective customers.[7]

The market for Plaintiff's products is highly competitive.[8] Plaintiff competes in the marketplace on the basis of freshness, quality, and price.[9] There are dozens (if not hundreds) of other companies, each selling its own line of products, competing for the same customers and market share that Plaintiff services.[10] Plaintiff's success is dependent, in part, on its ability to protect its proprietary customer information (both current and prospective), packer information (the companies that Plaintiff contracts with to pack/export seafood products), and business forecast information.[11] Plaintiff relies on a combination of copyright, trademark and trade secret laws, as well as confidentiality agreements and sales and licensing arrangements, to establish and protect its proprietary rights.[12]

The value of this proprietary information to Plaintiff cannot be overstated.[13] Plaintiff has spent many years and incurred substantial expense to both develop this proprietary information

---

[4]     <u>Id.</u>
[5]     <u>Id.</u>
[6]     <u>Id</u>.
[7]     <u>Id.</u>
[8]     <u>Id.</u> at ¶ 4.
[9]     <u>Id.</u>
[10]     <u>Id.</u>
[11]     <u>Id.</u>
[12]     <u>Id.</u>
[13]     <u>Id.</u> at ¶ 5.

and safeguard it from competitors.[14] In a highly competitive market, Plaintiff's trade secret information such as the names, contact information, and needs of current and prospective customers gives Plaintiff a continuing competitive advantage.[15] This information is not generally known and would be extremely difficult, if not impossible, to duplicate.[16] In addition to the protective measures described above, Plaintiff's employees are required to execute confidentiality agreements by which they agree to protect Plaintiff's proprietary information, acknowledge that the information is the sole property of Plaintiff, and agree to return any such information upon termination of their employment with Plaintiff.[17]

### B.   Turkin's Employment with Plaintiff

In September 2013, Plaintiff completed its acquisition of certain assets from Crystal Harbor Seafood, LLC.[18] In connection therewith, Plaintiff absorbed certain members of Crystal Harbor Seafood's sales force/executive team and began selling additional brands and products that were previously sold by Crystal Harbor Seafood.[19]

Turkin was one such employee that transitioned from Crystal Harbor Seafood to Plaintiff.[20] In August 2013, Plaintiff hired Turkin as its "Vice President of Marketing."[21] As a condition of his employment, on August 21, 2013 Turkin executed an Employment Agreement (the "Agreement") which provided for the terms of Turkin's employment by Plaintiff.[22]

---

14      Id.
15      Id.
16      Id.
17      Id.
18      Id. at ¶ 6.
19      Id.
20      Id. at ¶ 7.
21      Id.
22      Id. See also Exhibit B, a true and correct copy of the Agreement.

The Agreement provides that all "work product" (defined as business and marketing strategies, customer lists, trademarks, trade secrets, etc.) developed by and/or participated in by Turkin during his employment with Plaintiff is the sole and exclusive property of Plaintiff:

> 6. **Ownership Of Employee Developments**
>
> While employed by the Company, the Executive will devote all of his time and skills exclusively to the Company and will promptly disclose in writing to the Company all business and marketing strategies, customer lists, trademarks, trade secrets, inventions, improvements, ideas or copyrightable works (collectively "**Work Product**") made by the Executive or participated in by the Executive during his employment by the Company. The Executive hereby assigns, and agrees to assign, to the Company all right, title and interest in the United States and all foreign countries in all such Work Product. The Executive will execute all papers and perform all lawful acts which the Company requests to secure for the Company such legal protection in the United States and foreign countries for such Work Product as the Company deems desirable for its own purposes, and the Executive will continue to cooperate in this manner even after his employment by the Company ends. If any Work Product is described in a patent, trademark, or copyright application or disclosed to third parties by the Executive within one (1) year after leaving the employ of the Company and which relates to the then existing or reasonably anticipated business of the Company, it is to be presumed that the Work Product was conceived during the period of the Executive's employment by the Company and the Work Product will belong to the Company unless proved to have been conceived after termination of such employment.

The Agreement further provides that immediately upon termination of Turkin's employment, he is required to return to Plaintiff all documents and materials pertaining to Plaintiff's business or Turkin's employment with Plaintiff:

> 7. **Return Of Materials**
>
> Upon the request of the Company and, in any event, immediately upon the termination of the Executive's employment, the Executive will return to the Company all documents and materials pertaining to the Company's business or the Executive's employment (including all copies thereof), including without limitation, all materials and copies thereof relating to any confidential information of the Company.

During his employment with Plaintiff, Turkin's job responsibilities included, but were not limited to, directing and coordinating sales and marketing functions, developing and

coordinating sales selling cycle and methodology, developing new customers for products and services, identifying marketing opportunities, developing sales/marketing budgets, participating in the development of new project proposals, promoting positive relations with partners, vendors, and distributors, and other duties as assigned.[23]  In December 2015, Turkin's title was changed slightly to Vice President of Sales and Marketing (from Vice President of Marketing) to more accurately reflect the functions he was performing for Plaintiff.[24]  Plaintiff employed Turkin as Vice President of Sales and Marketing until March 22, 2016, at which time Turkin elected to terminate his employment with Plaintiff.[25]

        C.        **Turkin's Breach of the Agreement and Tortious Conduct**

Following Turkin's termination of employment, Plaintiff began hearing from several of its longstanding customers that 'Troy at Supreme' was actively contacting them to sell substantially similar products to those sold by Plaintiff while undercutting the prices that Plaintiff had previously offered.[26]  This news understandably concerned Plaintiff and therefore Plaintiff commissioned a forensic analysis of Turkin's work-issued laptop (which was returned to Plaintiff upon Turkin's termination of employment) and Plaintiff's own computer network to determine whether Turkin had improperly taken confidential data with him.[27]

The forensic analysis reveals that, between February 22, 2016 and March 11, 2016, Turkin accessed a number of confidential and proprietary files on Plaintiff's computer network and copied them to an external USB flash drive.[28]  Among the files copied by Turkin to this USB

---

[23]    See Contreras Decl. at ¶ 8.

[24]    Id.

[25]    Id.

[26]    Id. at ¶ 9.

[27]    Id.

[28]    Id. at ¶ 10; see also Declaration of Michael Ciarmitaro, dated June 14, 2016 (the "Ciarmitaro Decl."), a true

flash drive was one named "blue Swimming Customers.pdf" and one named "Retail POS" (point of sale).[29]  These documents contain the name, contact information, and sales/pricing information of a substantial (if not all) of Plaintiff's customers and vendors.[30]  Turkin had no legitimate business reason to copy such information to an external flash drive in February/March 2016, and thus it appears he copied the information solely to breach the Agreement and gain an unfair competitive advantage over Plaintiff in his then-forthcoming business ventures.[31]

In addition to improperly copying customer information, Turkin also deleted certain customer information from Plaintiff's customer database file in the days prior to his termination of employment.[32]  The information deleted was for two accounts that Turkin was developing for Plaintiff during the first quarter of 2016.[33]  When Plaintiff attempted to reassign these customer files to another employee following Turkin's termination of employment, Plaintiff discovered that the entire record had been deleted from the system prior to Turkin's departure.[34]

        **D.**    **Turkin's Employment by Supreme and Contact with Plaintiff's Clients**

Immediately after terminating his employment with Plaintiff, Turkin accepted a position as Chief Operating Officer at Supreme, a direct competitor of Plaintiff.[35]  While employed by Crystal Harbor, Turkin worked closely with Andy Walton (another Crystal Harbor salesman/executive) in developing client accounts and marketing Crystal Harbor's products to its

---

and correct copy of which is attached hereto as Exhibit "C," at ¶¶ 5-6.

[29]    See Ciarmitaro Decl. at ¶¶ 5-6; see also Contreras Decl. at ¶ 10.

[30]    Id.

[31]    Id.

[32]    Id. at ¶ 11.

[33]    Id.

[34]    Id.

[35]    Id. at ¶ 12; see also Exhibit "D," a true and correct screen capture of Turkin's LinkedIn profile.

customers.[36]  Both Turkin and Mr. Walton accepted employment with Plaintiff following Plaintiff's acquisition of Crystal Harbor.[37]  Mr. Walton terminated his employment with Plaintiff in November 2015 and began working for Supreme as a salesman/executive thereat.[38]

Supreme is owned by an Indonesian crab meat packer who, for the past several years, has been aggressively attempting to penetrate the distribution market by targeting Plaintiff's customers and employees.[39]  Much like Plaintiff, Supreme sells 'blue swimming crab' through its sales force.  Supreme markets to the same demographic segment of prospective clients as Plaintiff and competed directly with Plaintiff on many accounts.[40]  If Supreme were to obtain the date misappropriated by Turkin, it would gain an immediate competitive advantage over Plaintiff, and such would allow Supreme unfettered access to proprietary information that Plaintiff has fought to protect from its competitors.[41]

Plaintiff's suspicions that Supreme had directly Turkin to terminate his employment and misappropriate the confidential data at issue in this action were recently confirmed during telephone conversations initiated by a former Supreme employee.[42]  On June 3, 2016, Alan Mohl (Plaintiff's Chief Financial Officer) received a telephone call from a woman who identified herself as Melissa Jimenez, a former employee of Supreme who had recently terminated her employment with Supreme after learning of the filing of Plaintiff's Complaint and the allegations

---

[36] See Contreras Decl. at ¶ 12.

[37] Id.

[38] Id.

[39] Id. at ¶ 13.

[40] Id.

[41] Id.

[42] See Declaration of Alan Mohl, dated June 10, 2016 ("the "Mohl Decl."), a true and correct copy of which is attached hereto as Exhibit "E," at ¶ 3.

therein.[43]

During that call (and additional calls thereafter), Ms. Jimenez stated while employed by Supreme she witnessed Turkin and other members of Supreme's management openly discussing the fact that Turkin had taken customer and sales data from Plaintiff.[44]  Further, Ms. Jimenez told Mr. Mohl that Turkin and other members of Supreme's management had distributed Plaintiff's customer and sales data to the members of Supreme's sales team for their use in targeting Plaintiff's customers.[45]  According to Ms. Jimenez, Turkin and Supreme had been in contact prior to his termination of employment with Plaintiff and they had openly discussed access to Plaintiff's confidential data at that time.[46]  Upon learning of the lawsuit and the allegations therein, Ms. Jimenez terminated her employment with Supreme and offered to make herself available to testify in this matter.[47]

In the months following Turkin's termination of employment, Plaintiff has been informed by several current and prospective clients that they were contacted by 'Troy at Supreme' to sell them substantially similar product (e.g. blue swimming crab) while undercutting price quotes previously made by Plaintiff.[48]  The only way Turkin would have access to Plaintiff's client and/or pricing data is if he failed to return such data upon termination of employment (as required by the Agreement) or if he purposefully copied such data to the above-referenced flash drive prior to his departure.[49]

---

[43]   Id.

[44]   Id. at ¶ 4.

[45]   Id. at ¶ 5.

[46]   Id. at ¶ 6.

[47]   Id. at ¶ 7.

[48]   See Contreras Decl. at ¶ 14.

[49]   Id.

# ARGUMENT

## I. Legal Standard

To obtain a preliminary injunction, the moving party must demonstrate all four of the following:

(a) There is a substantial likelihood on the success on the merits;

(b) The preliminary injunction is necessary to prevent irreparable injury;

(c) The threatened injury outweighs the harm that the preliminary injunction would cause to the nonmovant; and

(d) The preliminary injunction would not be adverse to the public interests.

See Snowden v. Town of Bay Harbor Islands, Florida, 358 F. Supp. 2d 1178, 1188 (S.D. Fla. 2004) (citing Parker v. State Board of Pardons and Paroles, 275 F. 3d 1032, 1035 (11th Cir. 2001). The goal of a preliminary injunction "is to prevent irreparable harm and to preserve the district court's power to render a meaningful decision after a trial on the merits." Loans of America FL, LLC v. Rapid Auto Loans, LLC, No. 10-60416-CIV, 2010 WL 2754336, at *5 (S.D. Fla. July 12, 2010).

## II. There is a Substantial Likelihood that Plaintiff Will Succeed on the Merits of Its Claims Against Defendants

### A. Misappropriation of Trade Secrets (Counts I and II)

Count I of the Complaint asserts a misappropriation claim against Defendants under the Defend Trade Secrets Act of 2016 (18 U.S.C. § 1836(b)(1)), and Count II of the Complaint asserts a misappropriation claim against Defendants under Florida's Uniform Trade Secrets Act. Pursuant to 18 U.S.C. § 1836(b)(1), "[a]n owner of a trade secret that is misappropriated may bring a civil action under this subsection if the trade secret is related to a product or service used in, or intended for use in, interstate or foreign commerce." The statute defines "trade secret" similarly to Florida state law, and includes all forms of financial and business date if the owner

takes reasonable measures to keep it secret and the information derives independent value from not being generally known.  See 18 U.S.C. § 1839(3).

The elements of a misappropriation of trade secrets claim under Florida law are: (1) the plaintiff possessed secret information and took reasonable steps to protect its secrecy; and (2) the secret plaintiff possessed was misappropriated, either by one who knew or had reason to know that the secret was improperly obtained or by one who used improper means to obtain it.  See Gen. Parts Distrib. LLC v. Enright, No. 8:13-CV-2500-T-23EAJ, 2013 U.S. Dist. LEXIS 183101, at *18 (M.D. Fla. Dec. 6, 2013).

"Generally, Florida law considers a business's customer lists and the information contained therein to be trade secrets subject to protection if that information is compiled from non-public information and is kept confidential by the business."  All Leisure Holidays Ltd. v. Novello, No. 12-62328-CIV-ROSENBAUM, 2012 U.S. Dist. LEXIS 168774, at *11 (S.D. Fla. Nov. 27, 2012) (collecting cases); see also Bright House Networks, LLC v. Cassidy, 129 So. 3d 501, 506 (Fla. 2d DCA 2014) ("A customer list that is not readily ascertainable by the public can be a trade secret.").  Here, Plaintiff has a substantial likelihood of succeeding on these two claims.  As explained in the Contreras Decl., Plaintiff's sales and customer data is kept confidential, is protected from disclosure through written employment agreements, is compiled and distilled from non-public information, and has independent economic value as it allows Plaintiff to have a competitive advantage in the marketplace.  There is no question that the data misappropriated (consisting of Plaintiff's customer contact information and sales/pricing information for the misappropriated clients) constitutes a trade secret.

Further, there is no question that the data was "misappropriated" by Turkin.  As confirmed by the forensic analysis performed on Turkin's laptop and Plaintiff's network, Turkin

copied Plaintiff's customer and sales data to an external drive within days of abruptly terminating his employment with Plaintiff. That Turkin was contractually prohibited from doing so only serves to further confirm that his actions were plainly misappropriation.

### B. Breach of Contract (Count III)

Count III of the Complaint asserts a claim for breach of the Agreement against Turkin. In Florida, the elements of a breach of contract action are: "(1) a valid contract; (2) a material breach; and (3) damages." Abbott Labs., Inc. v. Gen. Elec. Capital, 765 So. 2d 737, 740 (Fla. 5th DCA 2000). Here, there is no question that the Agreement is a valid contract. The Agreement provides that information provided to and/or developed by Turkin during his employment with Plaintiff is the sole and exclusive property of Plaintiff. The Agreement further provides that Turkin will return to Plaintiff upon termination of employment all materials pertaining to Plaintiff's business, including any confidential information. Turkin clearly breached these provisions by copying confidential data to a flash/external drive and delivering such confidential data to Supreme, a direct competitor to Plaintiff. Finally, Plaintiff has incurred damages as a result of Turkin's breach as Turkin – to this day – continues to target Plaintiff's customers and undercut Plaintiff in the market by utilizing the information he has stolen from Plaintiff.[50] Plaintiff has lost both sales and customer goodwill as a result of Turkin's breach.[51]

### C. Conversion (Count IV)

Count IV of the Complaint asserts a claim for conversion against Defendants. "Under Florida law, the elements of conversion are (1) an act of dominion wrongfully asserted; (2) over another's property; and (3) inconsistent with his ownership therein." Joe Hand Promotions, Inc.

---

[50]   See Contreras Decl. at ¶ 15.

[51]   Id.

v. Creative Entm't, LLC, 978 F. Supp. 2d 1236, 1241 (M.D. Fla. 2013). "It is not necessary for a person to deprive another of exclusive possession of their property in order to be liable for conversion." Warshall v. Price, 629 So. 2d 903, 904 (Fla. 4th DCA 1993). Here, Defendants have asserted dominion over Plaintiff's confidential data in a manner inconsistent with Plaintiff's ownership of the data. For the same reasons Plaintiff is substantially likely to succeed on its misappropriation and breach of contract claims, it is likewise substantially likely to succeed on its conversion claim.

### A.  Tortious Interference (Count V)

Count V of the Complaint asserts a claim for tortious interference against Supreme. "A tortious interference claim requires the following elements: (1) the existence of a business relationship; (2) the defendant's knowledge of the relationship; (3) the defendant's intentional and unjustified interference with the relationship; and (4) damage to the plaintiff as a result of the breach of the relationship." Fin. Info. Techs., Inc. v. Lopez, No. 8:15-cv-2784-T-30AEP, 2016 U.S. Dist. LEXIS 20384, at *10 (M.D. Fla. Feb. 19, 2016). The Complaint alleges that Supreme interfered with Plaintiff's contractual relationship with Turkin by soliciting him to terminate his employment with Plaintiff and soliciting him to misappropriate Plaintiff's confidential data.[52] The Complaint alleges that Supreme interfered with Plaintiff's relationship with its customers by utilizing Plaintiff's confidential data to directly solicit Plaintiff's customers and undercut Plaintiff's prior pricing proposals.[53]

---

[52]   See Complaint, ¶ 83.

[53]   Id. at ¶ 84.

Given Ms. Jimenez's disclosures (as summarized in the Mohl Decl.),[54] it is substantially likely that Plaintiff will succeed in showing that Supreme solicited Turkin, while still employed by Plaintiff, to misappropriate Plaintiff's data and that Turkin/Supreme are utilizing that data to unfairly compete with Plaintiff in the market.

**III.   Injunctive Relief is Necessary to Prevent Irreparable Harm**

Plaintiff will suffer irreparable harm if Defendants are not prevented from utilizing Plaintiff's confidential data to drive a wedge between Plaintiff and its customers. Notably, "[u]nder Florida law, 'irreparable harm and inadequate remedy at law should be presumed in an action for injunctive relief with respect to the misappropriation of a trade secret.'" Aquent LLC v. Stapleton, No. 6:13-cv-1889-Orl-28DAB, 2014 U.S. Dist. LEXIS 4151, at *7-8 (M.D. Fla. Jan. 13, 2014) (quoting Dotolo v. Schouten, 426 So. 2d 1013, 1015 (Fla. 2d DCA 1983)). Here, Defendants misappropriated confidential/trade secret data (which also constituted a breach of the Agreement) with the intention of using that data to directly solicit Plaintiff's clients and undercut Plaintiff in the market. Plaintiff has already lost customers and is being forced on a daily basis to respond to customers as to why "Troy at Supreme" is undercutting Plaintiff on all of its recent price quotes. The harm to Plaintiff's business and customer goodwill is not only real, but it is also irreparable. Money damages alone cannot repair the shattered relationships that Defendants' intentional conduct is causing.

**IV.   Balance of the Harms**

The relative hardships to the parties heavily favors the granting of injunctive relief. Defendants cannot be 'harmed' by an order requiring Turkin to comply with the Agreement by

---

[54]   On a motion for preliminary injunction, Plaintiff may rely on hearsay evidence. See Levi Strauss & Co. v. Sunrise Int'l Trading Inc., 51 F.3d 982, 985 (11th Cir. 1995) ("At the preliminary injunction stage, a district court may rely on affidavits and hearsay materials which would not be admissible evidence for a permanent injunction, if the evidence is 'appropriate given the character and objectives of the injunctive proceeding.").

returning Plaintiff's confidential data and preventing Defendants from utilizing data they never should have had in the first place. Plaintiff, however, is suffering substantial and irreparable harm as a result of Defendant's calculated efforts to target Plaintiff's customers and drive a wedge between them and Plaintiff.

**V.    The Public Interest**

"The public has an interest in contracts being performed as agreed."  TFG Life Settlements, LLC v. Centurion Ins. Servs. Grp., LLC, No. 2:15-cv-755-FtM-38CM, 2015 U.S. Dist. LEXIS 162837, at *6 (M.D. Fla. Dec. 4, 2015); see also MEDai Inc. v. Quantros, Inc., No. 6:12-cv-840-Orl-37GJK, 2012 U.S. Dist. LEXIS 115504, at *24 (M.D. Fla. Aug. 16, 2012) ("The public has an interest in protecting and enforcing valid contracts.").  Further, "Florida law recognizes that protecting trade secrets furthers the public interest." All Leisure Holidays Ltd. v. Novello, No. 12-62328-CIV-ROSENBAUM, 2012 U.S. Dist. LEXIS 168774, at *15-16 (S.D. Fla. Nov. 27, 2012).  Here, Plaintiff seeks only to have Turkin comply with his obligations under the Agreement (namely, the return of Plaintiff's customer/sales data) and to have Defendants cease utilizing such data (which they have no right to) in direct competition with Plaintiff.  The injunction sought by this motion clearly serves the public interest.

## **CONCLUSION**

For the foregoing reasons, Plaintiff seeks and Order from this Court: (a) requiring Defendants to return to Plaintiff all customer lists, sales data, and other confidential data (including, but not limited to, the data contained in the "blue Swimming Customers.pdf" and "Retail POS" files) that was retained by Turkin upon his termination of employment with Plaintiff; (b) prohibiting Defendants from utilizing such data for any purpose during the course of this litigation; (c) prohibiting Defendants from contacting and/or soliciting any of the

customers identifiable in the "blue Swimming Customers.pdf" file or in any other file/document improperly retained by Turkin; and (d) for such further relief as the Court deems proper.

Dated: June 14, 2016.
               DESOUZA LAW, P.A.
               101 NE Third Avenue
               Suite 1500
               Fort Lauderdale, FL 33301
               Telephone: (954) 603-1340
               DDesouza@desouzalaw.com

               By: /s/ Daniel DeSouza, Esq._____
                 Daniel DeSouza, Esq.
                 Florida Bar No.: 19291

## **CERTIFICATE OF SERVICE**

I hereby certify that on June 14, 2016, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF, which will electronically serve all counsel of record. I further certify that on June 14, 2016, the foregoing document was served on counsel for Turkin[55] via e-mail to: Melissa D. Visconti, Esq., mvisconti@dvllp.com, Damian & Valori LLP, 1000 Brickell Avenue, Suite 1020, Miami, Florida 33131. I further certify that on June 14, 2016, the foregoing document was served on Supreme via US Mail to: Supreme Crab & Seafood, Inc., 7735 NW 48th Street, Suite 100, Doral, FL 33166.

               DESOUZA LAW, P.A.
               /s/ Daniel DeSouza, Esq._____

4840-8767-0066, v. 1

---

[55] Mr. Turkin's counsel has not yet entered a formal appearance in this action, but has sent correspondence to undersigned counsel stating that it was retained by Turkin with respect to defense of this matter.